## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### Honorable Howard R. Tallman

| | |
|---|---|
| In re: ) | |
| ) | |
| **MICHAEL WAYNE EMBERTON,** ) | **Case No. 11-15328 HRT** |
| ) | **Chapter 7** |
| Debtor. ) | |
| ) | |
| ———————————————— ) | |
| ) | |
| **CARL EDWARDS and** ) | **Adversary No. 11-01422 HRT** |
| **EARTH CONTRACTORS, INC.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **MICHAEL WAYNE EMBERTON,** ) | |
| ) | |
| **Defendant.** ) | |
| ———————————————— ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court for trial on the Plaintiffs' Complaint. After a two-day evidentiary hearing on June 5-6, 2013, the Court took the matter under advisement. The Court is now prepared to rule, and hereby finds and concludes as follows.

## BACKGROUND

Plaintiff Carl Edwards ("Mr. Edwards") has many years' experience in the construction industry, particularly in the areas of excavation and earth moving. He founded Plaintiff Earth Contractors, Inc. ("ECI") in 2005. He served as ECI's President and owned 100% of ECI's stock.

In 2007, Mr. Edwards met Debtor-Defendant Michael Emberton ("Mr. Emberton"), through a construction project for which ECI was a subcontractor. ECI subsequently hired Mr. Emberton as an estimator/operator. Mr. Edwards and Mr. Emberton discussed selling ECI to Mr. Emberton and a business partner, but an agreement was not reached, and Mr. Emberton left ECI for other employment. At the time Mr. Emberton left ECI's employment, he owed Mr. Edwards approximately $20,000 on a personal loan, which Mr. Edwards forgave, in light of the parties' failure to work out a deal for Mr. Emberton to purchase ECI.

In 2010, Mr. Edwards approached Mr. Emberton to renew the parties' discussions about Mr. Emberton's purchasing ECI. The parties executed a Stock Purchase Agreement (the

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01422 HRT

"Agreement"), a Conditional Assignment of Stock, and a Promissory Note, all dated May 19, 2010.  The Agreement provided that Mr. Edwards would sell all of his stock in ECI to Mr. Emberton for a purchase price of $1,000,000, to be paid in monthly installments of $25,000, beginning October 1, 2010, and ending October 1, 2013.  The Agreement further provided that until the purchase price was paid in full, Mr. Edwards would retain his full ownership interest in the stock, would remain as a director and officer of ECI, and would serve as a part-time manager/consultant of ECI.  Paragraph 8.1.7 of the Agreement provided as follows:

> All bids, jobs and contracts will be the sole responsibility of [Mr. Emberton].  All expenses incurred as [of] the Agreement Date shall be the sole responsibility of [Mr. Emberton].  There will be no distribution of funds, unless otherwise agreed by the parties in writing, until the Note as been paid in full and the Closing completed.

Mr. Edwards loaned Mr. Emberton $25,000 to open a new bank account for ECI at Farmers State Bank ("FSB").  Checks drawn on the FSB account required two signatures, one by Mr. Emberton, and another by Mr. Edwards, Matt Peterson (an ECI employee), or Georgia Romine (an ECI employee, and the significant other of Mr. Edwards).

Mr. Emberton brought some new business to ECI, including a contract with the City of Burlington, Colorado, to improve the city's wastewater treatment facility.  The contract amount was initially $909,000, and was later amended, through change orders, to $1.3 million.  The contract required the posting of a bond, which ECI procured from Old Republic Surety Company.  The bond was personally guaranteed by Mr. Edwards, as Mr. Emberton had not yet established sufficient credit to obtain his own bonds for ECI.

It does not appear that the parties prepared a written policy or otherwise documented their agreement regarding payment of salary and reimbursement of expenses.  But, the parties agreed that both Mr. Edwards and Mr. Emberton were to receive salary payments of $1,000 per week for weeks that they worked,[1] and both were to be reimbursed for business expenses, including job site supplies, meals, lodging, and gas.  Each time that Mr. Emberton requested a check or a cash payment, whether it was stated to be for salary or expenses, the request was granted.  The FSB checks were usually written by Ms. Romine, who was ECI's bookkeeper, and signed by either Ms. Romine or Mr. Edwards.  For example, FSB check number 2567 was written to Mr. Emberton in the amount of $4,500.00.  Ms. Romine wrote the check at Mr. Emberton's request, and Mr. Edwards provided the second signature.  The "memo" line of the check indicates that it was for "reimbursement for receipts," but Ms. Romine testified that Mr.

---

[1]  At some point, Mr. Emberton increased his salary to $1,500 per week.  Mr. Edwards learned of the increase and objected to it, and Mr. Emberton's salary was reduced to $1,000 per week.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01422 HRT

Emberton told her he needed the money for Christmas shopping.  Mr. Edwards did not recall this statement, and Mr. Emberton denied making it.

The Plaintiffs allege that Mr. Emberton failed to submit receipts supporting many of his reimbursement requests, and several of the receipts he submitted did not substantiate the reimbursements he received.  Plaintiffs' Exhibit 33 consists of gas receipts that the Plaintiffs claim Mr. Emberton submitted for reimbursement in October 2010.  The receipts reflect various purchases in different people's names, for different types of gas, at different times of the day, often on the same day.  The Plaintiffs argue that Mr. Emberton pulled the receipts out of the trash and submitted them for reimbursement, with fraudulent intent.  The gas receipts on Exhibit 33 total $365.06.

The Plaintiffs also question the business nature of other charges paid for by ECI, including payments for a horse trailer that the Plaintiffs argue was Mr. Emberton's personal trailer.  Mr. Emberton argues that the trailer was used to haul construction supplies.  The Plaintiffs question a substantial restaurant bill at Red Lobster, which Mr. Emberton claims was a business dinner with city inspectors on one of ECI's projects.  The Plaintiffs also question payments made to Arthur Porter, who they assert was Mr. Emberton's personal attorney.  Mr. Emberton argued that Arthur Porter was ECI's attorney.

During the fall and winter of 2010, the relationship between Mr. Edwards and Mr. Emberton deteriorated.  Mr. Edwards claims that Mr. Emberton withdraw excessive funds from the company.  Mr. Emberton claims that Mr. Edwards paid himself funds without authorization and also interfered with Mr. Emberton's management of the company and of projects the company was working on.  Mark Rayome, who reviewed ECI's work on the Burlington project on behalf of McLaughlin Engineering, testified that at one point in September of 2010, he asked Mr. Edwards to leave the job site, because, in Mr. Rayome's opinion, Mr. Edwards was interfering with on-site management and "had become a detriment to the project."  Mr. Edwards denies that he was a detriment and asserts that, as an officer of ECI, he was entitled to investigate and oversee jobs on which ECI was working, particularly because Mr. Edwards was still personally liable on the bonds issued to ECI.

The $25,000 stock payment due to Mr. Edwards on October 1, 2010, was paid late, and after that, no further $25,000 payment was made.  In November and December, 2010, counsel for Mr. Edwards sent demand letters to Mr. Emberton, requesting payment of the November 2010 and December 2010 payments.

In December 2010, Mr. Emberton opened an account at U.S. Bank, in the name of ECI. Checks on the U.S. Bank account required only one signature, that of Mr. Emberton.  ECI and Mr. Edwards argue that Mr. Emberton opened the U.S. Bank account with the intent to divert funds.  Mr. Emberton argues that he was trying to preserve his ability to operate ECI.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01422 HRT

During January 2011, the parties communicated to each other through counsel. On January 14, 2011, the parties held a meeting, with their counsel, but were unable to resolve their disputes. Mr. Edwards called an emergency meeting of ECI's members and shareholders to take place January 27, 2011, at 3:30 p.m., with two agenda items: to elect new officers and directors of the company and to terminate the managerial and operational duties of Mr. Emberton. Notice of this meeting was provided to Mr. Emberton and his counsel by letter dated January 26, 2011.

On January 27, 2011, shortly before the emergency meeting was to take place, Mr. Emberton wrote himself four checks totaling $34,319.36, from the U.S. Bank account. Mr. Emberton characterizes the checks as "bonus checks," and he asserts that payment of such bonuses was typical in the construction industry. Mr. Edwards argues that the payment of such bonuses was never authorized, and that the withdrawal reduced account funds that were needed to pay ECI's employees and subcontractors. After writing the checks, and before the emergency meeting was concluded, Mr. Emberton resigned.

At the time Mr. Emberton resigned, the Burlington project was ongoing, and problems had developed, including an unexpected amount of sludge that needed to be removed from the ponds. From February through June of 2011, Mr. Edwards continued to direct work on the Burlington project, under the name of ECI and under the name of another company owned by Mr. Edwards, C&C Excavating. In March 2011, one of the project's subcontractors, Master Electric, submitted a claim against the project's bond, in the amount of $95,951. The surety, Old Republic, declined to pay ECI, C&C, or Mr. Edwards any further amount while the subcontractors were unpaid. The City of Burlington recommended that Mr. Edwards be allowed to complete the project, but the surety would not approve that request, and the City declared ECI in default on July 25, 2011. The surety obtained bids from other contractors to complete the project, and filed a lawsuit against Mr. Edwards and ECI in El Paso County, Colorado District Court. That court subsequently entered judgment in favor of the surety and against ECI and Mr. Edwards, in the amount of $370,678.85, plus interest, costs, and attorney's fees (later determined to be $144,389.15). Mr. Edwards satisfied the judgment by cashier's check to Old Republic in the amount of $515,068.00, and Old Republic filed a satisfaction of judgment with the El Paso County Court.

Meanwhile, Mr. Emberton filed a voluntary bankruptcy petition on March 16, 2011. Mr. Emberton's case was originally filed under Chapter 13, but was later converted to Chapter 7. ECI and Mr. Edwards timely filed the above-captioned adversary proceeding, seeking a determination that Mr. Emberton's debt to them was nondischargeable under 11 U.S.C. § 523(a)(4). While the adversary proceeding was pending, Mr. Emberton's attorney, Julie Cliff, filed two motions to withdraw as attorney of record, which this Court denied. By minute order dated January 16, 2013, the Court set the adversary proceeding for trial on June 5 and 6, 2013. The Court's order provided that Ms. Cliff was to remain as attorney of record through the trial, unless Mr. Emberton was able to obtain substitute counsel before then.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01422 HRT

On May 15, 2013, the Court conducted a pretrial conference. At that time, counsel for the Plaintiffs had filed a pretrial statement, but Mr. Emberton had not. Ms. Cliff appeared by phone at the pretrial conference, and the Court ordered counsel to file a pretrial statement by May 17, 2013. Ms. Cliff filed a pretrial statement on behalf of Mr. Emberton on May 21, 2013.

On June 4, 2013, the day before trial was scheduled to begin, Ms. Cliff filed an ex parte motion to continue the trial, representing that Ms. Cliff and Mr. Emberton had difficultly communicating and that Mr. Emberton wished to proceed pro se. On June 5, 2013, Ms. Cliff did not appear for trial. Mr. Emberton requested a continuance to obtain new counsel, which this Court denied for the reasons stated on the record in open court. The trial proceeded, and the parties presented their evidence and argument.

## DISCUSSION

Section 523(a)(4) of the Bankruptcy Code provides that an individual's Chapter 7 discharge does not discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 524(a)(4). The Plaintiffs argue that Mr. Emberton had a fiduciary duty to them, and breached this duty by overpaying himself in salary, improper expense reimbursements, and improper bonuses.

Whether a debtor is a fiduciary is a matter of federal law, although state law is relevant to the inquiry. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir. 1996). In the context of § 523(a)(4), the term "fiduciary" has a narrow meaning. "Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability." *Id.* at 1371-72 (citations omitted). General fiduciary duties under state law are insufficient to form the basis of nondischargeability under § 523(a)(4). *See Horejs v. Steele (In re Steele)*, 292 B.R. 422, 434 (Bankr. D. Colo. 2003) (director's general fiduciary duties owed to shareholder are, without more, insufficient to satisfy the requirements of § 523(a)(4)). In order to establish a fiduciary duty under § 523(a)(4), a plaintiff must show either an express or a technical trust. *Id.* The Court will discuss separately whether the Plaintiffs here have established the existence of an express or a technical trust.

### A.   Express Trust

An express trust requires the intent to create a trust, a clearly defined trust res, and specific trust duties. *See Griego v. Gonzales (In re Gonzales)*, 483 B.R. 1, 11-12 (Bankr. D. N.M. 2012). Under Colorado law, creation of an express trust requires unequivocal and unambiguous language or conduct. *Morgan v. Wright*, 399 P.2d 788, 790–91 (Colo. 1965). While specific formal or technical words are not necessary, *see Marshall v. Grauberger*, 796 P.2d 34, 36 (Colo. Ct. App. 1990), the fact that a document makes no mention of a "trust" is significant in determining whether a trust was intended, particularly where the document is

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01422 HRT

drafted by an attorney. *See Denver Chapter No. 145, Order of Ahepa v. Mile Hi City Chapter No. 360*, 469 P.2d 740, 742 (Colo. 1970).

Here, the parties executed a Stock Purchase Agreement, a Conditional Assignment of Stock, and a Promissory Note. Each document was drafted by counsel. None of the documents provide that Mr. Emberton was to hold all funds received in trust for Mr. Edwards. None of the documents use the word "trust" or "fiduciary" to describe Mr. Emberton's obligations to Mr. Edwards. Although the Agreement specified that "[t]here will be no distribution of funds, unless otherwise agreed by the parties in writing, until the Note has been paid in full and the Closing completed," the parties' conduct belies a strict construction of that sentence, which would appear to prohibit the payment of any salary or expense reimbursement to either Mr. Edwards or Mr. Emberton until the Note was paid in full. The parties do not dispute that both Mr. Edwards and Mr. Emberton were paid a weekly salary for weeks that they worked, and both were paid reimbursement for expenses. Mr. Emberton did not always submit receipts supporting his reimbursement requests, which did not keep Mr. Edwards or his partner, Ms. Romine, from authorizing disbursements, by countersigning the checks on the FSB account, including FSB check number 2567, in the amount of $4,500.00, which Ms. Romine testified was for Mr. Emberton's Christmas shopping (a contention that Mr. Emberton denied, and Mr. Edwards did not recall). The Court can not find unequivocal and unambiguous language or conduct establishing the existence of an express trust, as required by applicable Colorado law and § 523(a)(4).

The Plaintiffs argue that Mr. Emberton conceded, in his pretrial statement (docket #83, at 8), that he had a fiduciary duty to Mr. Edwards. While factual assertions in pretrial statements may be treated as binding judicial admissions, *see Jenkins v. Tomlinson (In re Basin Resources Corp.)*, 182 B.R. 489, 492 (Bankr. N.D. Tex. 1995) (citing *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983)), here, Mr. Emberton's concession was not a factual assertion. Whether a fiduciary duty exists under § 523(a)(4) is not a question of fact; it is a question of law. *In re Young*, 91 F.3d at 1373. The doctrine of judicial admissions does not apply to questions of law. *Guidry v. Sheet Metal Workers Intern. Ass'n, Local No. 9*, 10 F.3d 700, 716 (10th Cir. 1993); *MacDonald v. General Motors Corp.*, 110 F.3d 337, 340-41 (6th Cir. 1997). Therefore, the Court cannot base any conclusion of fiduciary duty on Mr. Emberton's concession. The Court finds that the Plaintiffs have not established the existence of an express trust sufficient to support a finding of fiduciary duty under § 523(a)(4).

**B.     Technical Trust**

A technical trust can arise as a result of a state statute that imposes specific trust duties with respect to a specific trust res. *Griego v. Gonzales (In re Gonzales)*, 483 B.R. 1, 11-12 (Bankr. D. N.M. 2012). The Plaintiffs' Complaint cites the Colorado Mechanics Lien Trust Fund Statute, Colo. Rev. Stat. § 38-22-127, which has been held to create a trust sufficient to establish a fiduciary relationship for purposes of § 523(a)(4). *See Fowler & Peth, Inc. v. Regan*

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01422 HRT

*(In re Regan)*, 477 F.3d 1209, 1211 n.1 (10th Cir. 2007).  In this case, the projects in question were public works projects, which are not subject to the Mechanics Lien Trust Fund Statute, but instead are subject to the Colorado Public Works Contractors' Trust Fund Statute, Colo. Rev. Stat. § 38-26-109.  The Public Works Contractors' Trust Fund Statute is sufficient to establish a fiduciary duty under § 523(a)(4).  *See generally Bemas Constr. v. Dorland (In re Dorland)*, 374 B.R. 765 (Bankr. D. Colo. 2007).  Given the almost identical language in the two statutes, the Court finds the distinction to be without a difference, and will discuss case law applicable to either Trust Fund Statute.

To establish a prima facie case of breach of fiduciary duty under the Trust Fund Statute, the Plaintiffs must show (1) that Mr. Emberton is a fiduciary, because he received funds subject to a trust, as set forth in the Trust Fund Statute, and (2) that the Plaintiffs' claims arose because Mr. Emberton did not pay appropriate claims of the trust beneficiaries.  Once the Plaintiffs establish both the receipt of trust funds and the failure to pay trust beneficiaries, the burden shifts to Mr. Emberton to provide an accounting of how the trust funds were used.  *See Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 288 (10th Cir. BAP 1997) (describing the shifting burdens, in context of Mechanics' Lien Trust Fund Statute), *overruled on other grounds by Bullock v. BankChampaign, N.A*, 133 S.Ct. 1754 (2013).

Regarding Mr. Emberton's receipt of funds subject to a trust, as set forth in the Trust Fund Statute, Plaintiffs' Exhibit 10 includes six checks from the City of Burlington, Colorado.  It is undisputed that the Burlington checks were payment for ECI's work on the Burlington project. Five of the six checks, in the total amount of $692,997.26, were received by ECI while Mr. Emberton was managing the finances of ECI, and one, in the amount of $24,773.64, was received by Mr. Edwards's other company after Mr. Emberton resigned.  The funds received by ECI while Mr. Emberton was managing the company's finances are properly the subject of Mr. Emberton's fiduciary duty.  *See Alexander Co. v. Packard*, 754 P.2d 780 (Colo. Ct. App. 1988). The funds received after Mr. Emberton resigned are not properly the subject of Mr. Emberton's fiduciary duty.  The Court finds that the Plaintiffs have established a trust res in the amount of $692,997.26.

Having established that Mr. Emberton received funds subject to a trust, the Plaintiffs must next establish that their claim against Mr. Emberton arose because Mr. Emberton failed to pay trust beneficiaries with the trust funds he received.  The Court thus turns to evidence of unpaid claims of those who provided labor or materials on the Burlington project.  Mr. Emberton testified that when he resigned, all the subcontractors had been paid all amounts due to date.  The Court discounts this testimony as self-serving.  But, even if it were true that all submitted invoices had been paid at the time Mr. Emberton resigned, that fact may not be sufficient to show that Mr. Emberton fulfilled his fiduciary duty.  The Trust Fund Statute requires a contractor to hold all funds in trust pending the anticipated completion of a construction project. *People v. Collie*, 682 P.2d 1208, 1210 (Colo. Ct. App. 1983) (The purpose of the Mechanics' Lien Trust Fund Statute "is to protect homeowners, laborers, and materialmen from dishonest or

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01422 HRT

profligate contractors by requiring all contractors to hold in trust their customers' advance
payments received if any independent laborers or materialmen will be necessary to *complete* a
particular job.") (emphasis added), *cited in Mangum v. Siegfried (In re Siegfried)*, 5 Fed. Appx.
856 (10th Cir. 2001) (unpublished). The Court will therefore consider unpaid claims that arose
during or after Mr. Emberton's employment with ECI.

 The Court emphasizes that the Trust Fund Statute applies only to protect amounts due to
laborers and suppliers, and not to Mr. Emberton's contractual duties to Mr. Edwards under the
Agreement or otherwise. As another division of this Court stated: "the purpose of the Trust
Fund Statute is not to make [plaintiffs] whole for all amounts that they have lost due to a
debtor's breach of contract, but only for those amounts improperly withheld from laborers and
suppliers." *Spencer v. Five Oaks Homes, Inc. (In re Anderson)*, Adv. Pro. No. 08-1552 EEB, at
*9 (Bankr. D. Colo. Sept. 23, 2009), *aff'd*, No. 09-cv-02372-AP, 2010 WL 3843608 (D. Colo.
Sept. 27, 2010) (discussing Mechanics' Lien Trust Fund Statute). The Court will only consider
unpaid claims of laborers and suppliers.

 Plaintiffs' Exhibit 45 is a chart setting forth various payments made to subcontractors and
suppliers while Mr. Emberton was operating ECI. The Court cannot accept all of the payments
listed on Exhibit 45, for three reasons. First, some of the entities listed as "payor" on the chart
are not plaintiffs to this adversary proceeding. The Plaintiffs in this adversary proceeding are
without standing to pursue claims paid by other entities. Second, some of the entities listed, such
as insurance providers Acuity and United Fire Group, are not subcontractors or suppliers as
contemplated by the Trust Fund Statute. Finally, and perhaps most importantly, the payments
are not tied to specific projects. ECI worked on at least four separate projects while Mr.
Emberton was managing the company, but the trust fund evidence before the Court was limited
to the Burlington project. Given that limitation, the Court must limit the consideration of unpaid
claims to those on the Burlington project. The only item that satisfies each of the Court's listed
concerns is the claim of Master Electric, in the amount of $95,951, which was specifically
included in the findings of fact made by the El Paso County District Court. That claim was paid
by the surety on the Burlington project, Old Republic, and that payment was included in the
judgment entered against Mr. Edwards, which judgment Mr. Edwards subsequently satisfied.
Considering all the evidence before it, the Court finds that the Plaintiffs have established one
unpaid claim on the Burlington project, in the amount of $95,951.

 The Plaintiffs have established Mr. Emberton's fiduciary duty by establishing a trust res
in the amount of $692,997.26, subject to the Public Works Contractors' Trust Fund Statute. The
Plaintiffs have further established a breach of that fiduciary duty, by proving the existence of an
unpaid claim of Master Electric in the amount of $95,951. The burden thus shifts to Mr.
Emberton to account for the funds spent. *In re Storie*, 216 B.R. at 288. Here, the Court finds
that Mr. Emberton has not carried his burden. He has not shown that all funds received on the
Burlington project were properly disbursed to laborers, subcontractors, or material providers on
that project. *Cf. People v. Erickson*, 695 P.2d 804, 805-06 (Colo. Ct. App. 1984) (evidence that

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01422 HRT

all funds received were disbursed to laborers, subcontractors, or material providers on the project provides a defense to liability under the Trust Fund Statute). To the contrary, it appears that Mr. Emberton paid himself bonus checks, in the amount of $34,319.36, on January 27, 2011, shortly before he resigned. Those funds, and any other salary or reimbursements paid to Mr. Emberton rather than to Master Electric, form the basis of liability for breach of fiduciary duty. The remaining question before this Court is whether the evidence was sufficient to establish Mr. Emberton's mental state, as required for a conclusion that Mr. Emberton committed fraud or defalcation within the scope of § 523(a)(4).

After the Court heard evidence in this case, the Supreme Court decided *Bullock v. BankChampaign, N.A*, 133 S.Ct. 1754 (2013), which held that a plaintiff seeking to have a debt declared nondischargeable under § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity must establish that the defendant acted with a specific mental state, either actual knowledge of wrongdoing, or "reckless conduct of the kind that the criminal law often treats as the equivalent," including actions where the fiduciary "'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* at 1759-60 (quoting ALI, Model Penal Code § 2.02(2)(c), at 226, and § 2.02 Comment 9, at 248 (1985) (explaining that the Model Penal Code's definition of "knowledge" was designed to include "wilful blindness")). The substantial and unjustifiable risk "'must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" *Id.* at 1760 (quoting ALI, Model Penal Code § 2.02(2)(c), at 226).

Considering all of the evidence before the Court, the Court cannot find that Mr. Emberton acted with the requisite mental state with regard to his salary payments, cash advances, and expense reimbursements, even to the extent that those advances or requests were excessive or not accompanied by appropriate receipts. But, the Court does find that Mr. Emberton's payment of bonuses to himself, in the amount of $34,319.36, on January 27, 2011, shortly before he resigned, constitutes a gross deviation from the standard of conduct that a law-abiding fiduciary would observe. In paying himself those bonuses, Mr. Emberton drained most of the funds from the U.S. Bank account, leaving ECI without sufficient funds to pay the claim of Master Electric in particular, and the claims of other subcontractors and suppliers in general. Mr. Emberton testified that he acted on advice of counsel, but the Court does not find that testimony to be credible, given Mr. Emberton's overall lack of credibility and the lack of any corroborating evidence of counsel's advice, such as an e-mail, a letter, or testimony from the attorney involved. The Court thus finds that Mr. Emberton's payment of $34,319.36 in bonuses constitutes a defalcation while acting in a fiduciary capacity, sufficient for a determination of nondischargeability under § 523(a)(4).

The Plaintiffs have sought additional damages under Colo. Rev. Stat. § 38-22-127(5), which provides that any person who violates the Mechanics Lien Trust Fund Statute commits

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01422 HRT

civil theft.  In this case, the Mechanics Lien Trust Fund Statute is inapplicable to Mr. Emberton's conduct, because the projects involved were public works projects.  But, the Public Works Contractors' Trust Fund Statute applicable here contains almost identical language.  Colo. Rev. Stat. § 38-26-109(4).  The Court will therefore consider whether Mr. Emberton committed civil theft, as set forth in Colo. Rev. Stat. § 18-4-401.

In order to establish that Mr. Emberton committed civil theft, the Plaintiffs must show that Mr. Emberton acted with the requisite mental state, which the Colorado Supreme Court has described as follows:

> In the context of a construction trust fund violation, this intent may be established whenever:
>
> the offender knowingly obtains control over the property of another without authorization and, even though not intending to deprive the other person permanently of the use or benefit of the property, nonetheless knowingly uses the property in such manner as to deprive the other person permanently of the use or benefit of the property . . . .  In the context of theft of construction project trust funds, the "knowingly using" element of mental culpability in subsection 18-4-401(1)(b) does not require a conscious objective to deprive another person of the use or benefit of the construction trust funds, but instead requires the offender to be aware that his manner of using trust funds is practically certain to result in depriving another person of the use or benefit of the funds.

*People v. Anderson*, 773 P.2d 542, 545 (Colo. 1989); *see also In re Barnes*, 377 B.R. 289 (Bankr. D. Colo. 2007).  The mental state required for a finding of civil theft may differ slightly from that required for a finding of defalcation, announced by the Supreme Court in *Bullock*, but here the Court finds that Mr. Emberton's conduct meets both standards.  By paying himself bonuses totaling $34,319.36 shortly before resigning, leaving less than $3,500 remaining in the U.S. Bank account, Mr. Emberton was aware that his use of the funds was practically certain to result in depriving Master Electric in particular, and other subcontractors and suppliers in general, the use or benefit of the funds Mr. Emberton paid himself.  The Court finds that Mr. Emberton committed civil theft within the meaning of Colo. Rev. Stat. § 18-4-401.  Therefore, pursuant to Colo. Rev. Stat. § 18-4-405, the Plaintiffs are entitled to treble damages and reasonable attorney fees incurred in connection with bringing the civil theft action.  The Court will allow the Plaintiffs to submit evidence of such fees, to be limited to the costs of prosecuting the instant adversary proceeding, and not to include any costs for other actions in which the Plaintiffs were involved, including their defense of the El Paso County, Colorado District Court action brought by Old Republic.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
Adversary No. 11-01422 HRT

## CONCLUSION

For the reasons discussed above, the Court finds and concludes that the Plaintiffs have established the existence of a technical trust, in the amount of $692,997.26, pursuant to the Colorado Public Works Contractors' Trust Fund Statute, Colo. Rev. Stat. § 38-26-109(4).  The Plaintiffs have further established a breach of that trust by showing that Master Electric asserted a claim against the surety, Old Republic, in the amount of $95,951, which claim was included in the judgment entered against, and satisfied by, Mr. Edwards.  The Court finds and concludes that Mr. Emberton acted with the requisite mental intent for a finding of defalcation while acting in a fiduciary capacity when he wrote himself the bonus checks totaling $34,319.36 shortly before resigning.  Mr. Emberton's actions also constitute civil theft under Colo. Rev. Stat. § 18-4-401, entitling the Plaintiffs to treble damages and attorney fees under Colo. Rev. Stat. § 18-4-405.  The Court will therefore enter judgment against Mr. Emberton, in the amount of $34,319.36, trebled, with attorney fees to be added, which total amount is excepted from Mr. Emberton's discharge pursuant to § 523(a)(4).

Accordingly, it is

HEREBY ORDERED that the Plaintiffs are entitled to a judgment in their favor, in the amount of  $34,319.36, which amount is trebled pursuant to Colo. Rev. Stat. § 18-4-405, for a total of $102,958.08, which amount shall be excepted from the Defendant's discharge under § 523(a)(4).  The Court will enter a separate judgment to this effect, following the Court's determination of the attorney fees, as set forth below.  It is

FURTHER ORDERED that the Plaintiffs are entitled to reasonable attorney fees incurred in connection with bringing the civil theft action.  The Plaintiffs must submit evidence of their attorney fees within fourteen (14) days of the date of this Order.  Mr. Emberton may file an objection to the reasonableness of the attorney fees within fourteen (14) days after service of the Plaintiffs' evidence of fees.

Dated this __5th__ day of November, 2013.

BY THE COURT:

Howard R. Tallman, Chief Judge
United States Bankruptcy Court